The **RHODE ISLAND FAIR WELFARE RIGHTS ORGANIZATION et al.,**
Plaintiffs,

v.

The **DEPARTMENT OF SOCIAL AND REHABILITATIVE SERVICES**
et al., Defendants.

**Civ. A. No. 4567.**

United States District Court,
D. Rhode Island.

July 27, 1971.

sent the entire class of Rhode Island recipients of Aid to Families with Dependent Children (hereinafter AFDC), challenged a March 25, 1971 order of the Director of the Rhode Island Department of Social and Rehabilitative Services (hereinafter Department) which suspended all payments for items contained in the so-called "special needs" category of assistance of the AFDC program.[1] This Court granted plaintiffs' request for a temporary restraining order on April 2, 1971, and enjoined the defendants from failing to grant special needs payments on the same basis as they were provided on March 24, 1971. This Court found authority for that order in 42 U.S.C. § 602(a) (23), as interpreted in Rosado v. Wyman, 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970). The parties agreed to an extension of that order to allow the State the opportunity to develop a new program in compliance with federal law.

An Act of the State legislature subsequently was signed into law which provided in part:

"Section 40–6–9 of the general laws in Chapter 40–6, entitled Public Assistance, as enacted pursuant to Reorganization Plan No. 1 of 1970, is hereby amended to read as follows:

40–6–9. *Amount and standards of assistance.*—The amount of assistance which any recipient shall receive under the provisions of sections 40–6–6, 40–6–7 and 40–6–8 shall be determined with due regard to his requirements and the conditions existing in his situation, and to the income and resources available to him from whatever source, and shall be sufficient, when added to the income and resources determined to be available to him, to provide him with a reasonable subsistence compatible with health and well-being. The amount of assistance which any recipient eligible under the terms of sections 40–6–6, 40–6–7, and 40–6–8 shall receive, shall not exceed the standards of assistance approved

Cary J. Coen, John M. Roney, R. I. Legal Services, Inc., Providence, R. I., Adele M. Blong, Steven J. Cole, Center on Social Welfare Policy and Law, New York City, for plaintiffs.

Richard J. Israel, Atty. Gen., W. Slater Allen, Jr., Asst. Atty. Gen., Providence, R. I., for defendants.

Dept. of Health, Education and Welfare by Lincoln C. Almond, U. S. Atty., D. R. I., Providence, R. I., amicus curiae.

General Assembly of R. I. by William G. Gilroy, Providence, R. I., amicus curiae.

## OPINION

PETTINE, Chief Judge.

A review of the brief but frenetic history of this action is essential to an understanding of its present posture.

## I

### Procedural History

As originally filed, the class action plaintiffs herein, who purport to repre-

---

1. The structure of the AFDC program in Rhode Island is treated in detail under "II," *infra.*

and promulgated pursuant to the provisions of this section and sections 40–6–18, 40–6–20 and 40–6–22, *provided, however, that said standards of assistance shall not include payments for household equipment and furnishings or indebtedness and, provided further that a supplementary payment may be made in the event of an emergency of a catastrophic nature as defined by the director of the department of social and rehabilitative services.* The standards of assistance approved, promulgated and in effect as of January 1, 1971, shall continue to be maintained without change until further legislative action pertaining thereto." (emphasis added)

Regulations were promulgated by the Department on May 13, 1971, to carry out the legislative mandate. The plaintiffs thereafter filed an amended complaint, seeking injunctive relief against the new regulations. Since this new challenge rested on constitutional[2] as well as statutory (i.e., § 602(a) (23)) grounds, a three-judge court was requested pursuant to 28 U.S.C. § 2281. Finding immediate and specified irreparable injury from application of the new regulations to certain affiants who are members of the plaintiff class,[3] this

Court, on June 24, 1971, entered a limited temporary restraining order, pursuant to 28 U.S.C. § 2284(3), ordering resumption of special needs payments for household furnishings and equipment under the criteria that existed on March 24, 1971. Insofar as probability of success on the merits was a factor considered by me in evaluating the request for temporary relief, the opinion accompanying the restraining order considered solely the authority of § 602(a) (23) and *Rosado*, without considering the validity of the constitutional argument.

The remaining members of the three-judge court were appointed on July 7 and on July 12 an order was entered remanding the statutory issue for resolution by the single initiating judge while retaining jurisdiction of the constitutional claim, a procedure explicitly commended in *Rosado* and previously stipulated to by the parties herein. In anticipation of the fact that this procedure would leave the continued vitality of the June 24 restraining order in considerable doubt,[4] this Court held a full and complete hearing on July 6 on the merits of the statutory claim, at the conclusion of which the parties agreed to extend the restraining order to July 26 in order

---

2. See note 7, *infra.*

3. A motion has been filed seeking certification of this suit as a class action. Insofar as the only portion of this action presently pending before me is the statutory challenge, I find that this is a proper class action under Fed.R.Civ.P. 23(b) (2), in that the entire class of AFDC recipients in Rhode Island is so numerous that joinder of all members is impracticable, there are questions of law and fact common to the class, the claims of plaintiffs are typical of the claims of the entire class, the plaintiffs will fairly and adequately protect the interests of the class, and defendants have acted on grounds generally applicable to the class, thereby making appropriate final injunctive relief with respect to the class as a whole. I do not consider the question whether the constitutional challenge can properly be maintained by plaintiffs as a class action, but merely note that as to the Equal Protection argument, the inter-

ests of certain members of the class (persons with high-cost single occurrence needs) would appear to be antagonistic to the interests of certain other members (persons with recurring low-cost needs).

4. Since the remanded statutory issue was not a " * * * proceeding required by Act of Congress to be heard and determined by a district court of three judges * * *" 28 U.S.C. § 2284(3) would no longer appear to endow the restraining order with a duration longer than the normal 10-day period provided in Fed.R. Civ.P. 65(b), nor would the general policy reasons which support the extended life of a § 2284(3) order seem to apply on the remanded portion of the action. It appeared most plausible to this Court that the 10-day period of Rule 65 would run from the date of remand (at least if a new restraining order were entered that day), and therefore time was critical to all concerned.

to allow this Court time for consideration of written briefs and for disposition of the statutory claim, if it subsequently were remanded to me. On the basis of testimony presented at the hearing, the Court expanded its existing restraining order to include special needs payments for indebtedness on utility bills where the recipient faced a shut-off of service.

With prior agreement of the parties, this Court requested the participation of the Department of Health, Education and Welfare as an *amicus curiae*, which again was a procedure recommended by *Rosado*. A representative of H.E.W. attended the July 6 hearing, has submitted a substantial memorandum on the questions of law involved in this litigation and has, in short, given this Court complete cooperation and helpful advice, for which I am most appreciative.

## II

### Standard of Need

From at least January 1, 1968 to May 13, 1971,[5] the Rhode Island public assistance standard of economic security was defined as the aggregate of three categories of need:[6]

A. Individual Requirements
 covered basic needs for food, clothing, etc.

B. Group Overhead Items
 covered shelter, heat and utilities and

C. Individual Requirements under Specified Circumstances ("Special Needs") covered:

 1. Transportation
 2. Housekeeping Services
 3. Personal Maintenance During Temporary Hospitalization
 4. Household Equipment and Furnishings
 5. Telephone
 6. Indebtedness
 7. Moving

 8. Burial
 9. Special Medical Supplies

During that period, the basic Individual Requirements payment was budgeted for each AFDC recipient according to family size and age of children. Also during that period, Group Overhead Items were budgeted for each AFDC recipient on the basis of standard payments according to family size, for heat and utilities, and actual expenses for shelter costs. Finally, special needs payments were authorized only when a recipient demonstrated a need for an item allowable under that category, under criteria established in § 202 of the Public Assistance Manual and discussed *infra*. At all times relevant to this action, the amount of payment, if any, due an AFDC applicant or recipient has been the difference between the amount needed, as determined by the particular family's AFDC standard, and the income available to that family to meet such requirements. No adjustment of the basic monthly grant has been made since May 13.

Payment for any item included as a special need in the budget of an AFDC applicant or recipient has been made during all times relevant to this action either (1) by adding the money amount, as determined by the appropriate cost standard, to the regular bi-monthly assistance payment; or (2) by issuing a separate assistance check payable to the recipient or to the recipient and vendor, to cover the amount necessary to meet the particular special need; or (3) by voucher which authorizes the purchase of the particular special need item. Whichever method of payment is used, special need items have been, and are, included in the AFDC standard.

On May 13, 1971, the Department published a revision of the Public Assistance Manual, removing special need items 4, 6 and 7 from that category of assistance and setting forth " * * * new criteria and procedure for meet-

---

5. Except for the period March 24 to April 2, when special needs had been eliminated entirely.

6. R.I. Public Assistance Manual, Ch. II § 202 at 1 (rev. 4–1–70).

ing these needs through the Emergency Assistance Program, § 202.2" (see cover letter signed by James H. Reilly, Assistant Director of the Department, dated May 13, 1971, at 1.) It is these changes which constitute the sole controversy herein.

## III

### Emergency Assistance Program

The Emergency Assistance Program in broad outline provides payments for the former special needs items 4, 6 and 7 when a recipient faces an emergency need caused by a disaster beyond the control of the family (illustrative examples offered by the State being a fire or a flood). A recipient who demonstrates a need for emergency assistance under the foregoing criterion is ineligible, however, if he has received any other payment under the Emergency Assistance category during the preceding twelve months. Finally, any single payment is limited to a maximum period of 30 consecutive days.[7]

## IV

### Household Equipment and Furnishings

The criteria for meeting this category of need, prior to May 13, 1971, were as follows:

A. Household Furniture and Major Equipment—

"Purchase of household equipment which is considered to include major items essential to the operation of a home such as stoves, refrigerators, tables, and beds can be considered for persons with established homes when it has been determined that (1) these items are worn out beyond repair or that the condition of the item does not warrant costly repair investments, or (2) that the essential item(s) is lacking and the person is unable to operate a home without it. * * *" (R.I. Public Assistance Manual, Ch. II § 202 VII A at 6 (rev. 11–15–69)).

B. Household Furnishings—
"Purchase of household furnishings which are considered to include linens, curtains, pots, pans, dishes, etc., can be provided for when it is determined that the furnishings are worn beyond use, or that they are lacking entirely and the person does not have the ability to purchase them." (R.I. Public Assistance Manual, Ch. II § 202 VII B at 6 (rev. 11–15–69)).

Furthermore, prior to May 13, the Manual contained an Appendix to Section 202 entitled "Guidelines for Usual Housekeeping Items." It was a detailed inventory of bedroom, living room, kitchen and general items of household furnishings allowable under special needs category 4. The testimony at the July 6 hearing confirmed that these items were provided essentially on an "as needed" basis prior to May 13.

The criteria for meeting this category of needs, after May 13, 1971, are first of all the general Emergency Assistance Program criteria set forth in "III", *supra*. Thus it is no longer sufficient reason for assistance that a recipient is without a bed or a mattress, for example —he must also demonstrate that the need exists because of the occurrence of a "disaster beyond his control." Additionally, as noted above, if the recipient has received any other Emergency As-

---

7. The constitutional argument raised by plaintiffs rests upon the classification created by these requirements. Their precise argument is that there is no rational basis for meeting expensive one-time emergency needs while denying assistance to persons with low-cost recurring needs. The State's declared objective " * * * is to prevent the recurrence of financial emergencies in families and to minimize the chance of their re-currence." R.I. Public Assistance Manual, Ch. II § 202.2 at 1 (rev. 5/71). Whether the challenged classification is rationally related to that goal or to some other objective, such as minimization of administrative expenditures, is not before this Court at this time. See generally, Dandridge v. Williams, 397 U.S. 471, 485, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970).

sistance payment during the preceding year, he is ineligible for further Emergency Assistance, even if he has a demonstrated need resulting from a disaster beyond his control.

Apart from the general Emergency Assistance criteria, further restrictions have been placed specifically upon payments for household furnishings and equipment. The "Guidelines for Usual Housekeeping Items" have been declared "obsolete" (see cover letter signed by James H. Reilly, Assistant Director of the Department, dated May 13, 1971, at 1), and the Department will instead provide "only minimal essentials" (R.I. Public Assistance Manual, Ch. II § 202.2 at 1 (rev. 5/71)).

For the sake of completeness, I note that the State has imposed one final additional restriction on payments for this category of need—namely, that a recipient who lacks a stove for heating and/or cooking and who meets all other criteria for an Emergency Assistance payment (i.e., disaster beyond his control, no other Emergency Assistance for the past year) is nevertheless disqualified if that person or his family has been provided with a new stove within the last ten years.[8]

## V

### Payment of Indebtedness

The criteria for meeting this category of need, prior to May 13, 1971, were as follows:

"An amount to make payments on debts is provided when the payment will (1) prevent eviction, (2) prevent loss of gas or electric service or (3) save essential furniture purchased before the receipt of assistance and in which the individual has equity of at least 50 per cent of value.

The amount and rate of payment is determined (PA-81) by the casework supervisor after evaluation of the (1) amount of original bill and the items it covered, (2) present balance of the bill, and (3) type of adjustment the creditor is willing to make." (R.I. Public Assistance Manual, Ch. II § 202 IX at 7 (rev. 6-1-68)).

The Emergency Assistance Regulations alter the State's response to each of the three types of indebtedness. As to payment of indebtedness to prevent eviction, the State has imposed the general Emergency Assistance criteria explained in "III", supra, with the additional condition that a maximum of three months' rent or mortgage payments may be authorized. (R.I. Public Assistance Manual, Ch. II § 202.2 at 2 (rev. 5/71)). As to payment of indebtedness to prevent the termination of gas and/or electric service, the State has combined the Emergency Assistance criteria with a similar three-month maximum authorization. (R.I. Public Assistance Manual, Ch. II § 202.2 at 3 (rev. 5/71)). Finally, the State has eliminated entirely the payment of indebtedness to save essential furniture facing a threat of repossession. This elimination is clear from the face of the May 13 regulations and was conceded by Mr. Affleck in testimony before this Court.

---

8. The restrictions previously discussed are those which are explicitly established by the May 13 regulations. Three other restrictions have been pointed out for the first time in the post-hearing briefs which may lurk implicitly in those regulations. In the first place, the Department may have changed its prior procedures by no longer authorizing payment for layettes (see brief of H.E.W. as Amicus Curiae at 11). In addition the Department perhaps no longer provides for replacement of a refrigerator but only for its repair (in § 202.2 at 2, compare the item entitled "Repairs of Equipment for Heating, Cooking, and/or Refrigeration" with that headed "Replacement of Equipment for Heating and/or Cooking"). Finally, the new regulations can be interpreted as excluding payment for items of household equipment and furnishings to aid in the establishment of a home for a new recipient. These possibilities were not explored at the hearing nor does the opinion which follows depend in any way upon the propriety of the suggested interpretations.

## VI

### Moving Expenses

The criteria for meeting this category of need, prior to May 13, 1971, were as follows:

"The cost of moving is provided when it is *socially desirable* for a recipient to move and when the service cannot be provided by the city or town or other resources in the community. The amount provided is based on prevailing rates in the community and authorized on a PA–57B." (emphasis added). (R.I. Public Assistance Manual, Ch. II, § 202 X at 8 (rev. 7–1–69)).

After May 13, 1971, the State transferred moving expenses as a need item to its Emergency Assistance program, under the following additional restrictions:

"When the disaster beyond the control of the family involves moving, the cost of moving will be met under the following conditions:

1. When the family has been burned out and moving to other quarters is required; or

2. When a flood occurs and the family must locate in other quarters; or

3. When a natural disaster occurs which makes present shelter uninhabitable; or

4. When a family is evicted or the property is foreclosed; and

5. When the service worker, in working with the family, finds that the present quarters in which the family are living are injurious to the health or safety of the family."

## VII

### Applicable Law

The plaintiffs contend that each of the May 13 changes in the AFDC standard of need is invalid under 42 U.S.C. § 602(a) (23):

"§ 602. State plans for aid and services to needy families with children; contents; approval by Secretary

(a) A State plan for aid and services to needy families with children must * * *

(23) provide that by July 1, 1969, the amounts used by the State to determine the needs of individuals will have been adjusted to reflect fully changes in living costs since such amounts were established, and any maximums that the State imposes on the amount of aid paid to families will have been proportionately adjusted."

Reviewing the complex federal statutory scheme under which States may qualify for partial federal funding of their AFDC programs would serve no useful purpose here. Its essential structure has been laid out in *Rosado*,[9] but to summarize briefly, a State must meet the "plan conditions" found in subsections (1)–(23) of 42 U.S.C. § 602(a), in order to obtain federal financial participation. The plaintiffs here do not contend that the Rhode Island plan in effect prior to May 13, 1971 had not been properly approved by H. E. W., but on the other hand the defendants concede that the May 13 changes have not been approved, since H.E.W. has not had sufficient time to study them. But as noted in *Rosado*, welfare recipients have no means of stimulating this administrative review, so there is no question that this Court has jurisdiction to adjudicate this action despite the pending administrative proceeding.

This case, therefore, centers upon the interpretation and application of plan condition (23)—the exact provision in issue in *Rosado*—to the facts set out above. The Supreme Court stated its holding in *Rosado* as follows:

"Section 402(a) (23) invalidates any state program that substantially alters

---

9. 397 U.S. at 466 n. 8, 90 S.Ct. 1207, 25 L.Ed.2d 442.

the content of the standard of need in such a way that it is less than it was prior to the enactment of § 402(a) (23), unless a State can demonstrate that the items formerly included no longer constituted part of the reality of existence for the majority of welfare recipients." 397 U.S. at 419, 90 S.Ct. at 1221.

The date of enactment of § 402(a) (23) was January 2, 1968, and although the evidence offered was not entirely unambiguous on this point, I found as a fact above that the standard of need which existed on January 2, 1968 was substantially the same as that defined by § 202 of the R.I. Public Assistance Manual which was in effect immediately prior to the May 13, 1971 revisions here in issue. Thus the key inquiry is whether Rhode Island has "substantially altered the content of the standard of need" as computed under § 202 of the Public Assistance Manual (Mr. Affleck having conceded, in answer to an inquiry by this Court, that it was not the State's contention that any of the challenged items "no longer constitute part of the reality of existence. * * *").

 The plaintiffs do not argue that by transferring the former special needs items 4, 6 and 7 into a new category of Emergency Assistance they have been removed entirely from the standard of need (although it is interesting to note that the Legislature ordered those items to be eliminated from the "standard of assistance" (see text accompanying n. 2, *supra*) and also that the revised § 202 speaks of a "Public Assistance Standard of economic security *for regular recurring needs.* * * *" (emphasis added)). Instead they contend that the

content of the standard of need has been impermissibly lowered by the State by imposition of more restrictive conditions upon qualification for benefits, rather than by the outright withdrawal of items from the standard.

That argument appears to this Court eminently logical and persuasive, and perhaps may best be illustrated by an extreme hypothetical. If instead of eliminating its special needs category *in toto*, the State of New York had drafted new regulations which stated that an AFDC recipient could henceforth receive a special needs payment once every fifty years with a maximum payment of $1, could it seriously be contended that the outcome in *Rosado* would have been different? This Court fails to appreciate that it would.[10] Admittedly what the State of Rhode Island has done here is less drastic, but *Rosado* held that § 402(a) (23) is violated by a *substantial* alteration in the content of the standard of need. I find myopic the suggestion that in comparing the content of the original and revised standards of need I should merely examine. check lists of items included in each standard and not look to the availability of the items themselves.[11] The imposition of restrictive conditions can be just as effective as the total elimination of items in achieving the result held impermissible in *Rosado*:

"* * * a State may not redefine its standard of need in such a way that it skirts the requirement of re-evaluating its existing standard. This would render the cost-of-living reappraisal a futile, hollow, and, indeed, a deceptive gesture, and would avoid the consequences of increasing the num-

10. The General Assembly of the State of Rhode Island, as *amicus curiae*, takes the position that since the quoted passage from *Rosado* speaks in terms of the elimination of "items" from the standard of need, its holding should be limited to outright elimination. I find this interpretation untenable primarily for the reason that the statutory requirement could be robbed of its impact by a State which im-

posed new restrictions upon eligibility for benefits such that a recipient would have to satisfy such impossible conditions that the assistance theoretically available would be nearly impossible to obtain in practice.

11. As noted in *Rosado*, there is no relevant legislative history of this provision, from which to divine Congressional intent.

bers of those eligible and facing up to the failure to allocate sufficient funds to provide for them." 397 U.S. at 415, 90 S.Ct. at 1219.

Moreover plaintiffs have pointed out that H.E.W. regulations appear to recognize that conditions of eligibility are part of the standard of need.[12]

The *amicus* brief filed on behalf of H.E.W. takes a slightly different approach to the issue presented, though, as will be seen, reaches generally the same results as this Court. Its position is bottomed upon the following passages from *Rosado*:

"We do not, of course, hold that New York may not, consistently with the federal statutes, consolidate items on the basis of statistical averages. Obviously such averaging may affect some families adversely and benefit others. Moreover, it is conceivable that the net payout, assuming no change in the level of benefits, may be somewhat less under a streamlined program. Providing all factors in the old equation are accounted for and fairly priced and providing the consolidation on a statistical basis reflects a fair averaging, a State may, of course, consistently with § 402(a) (23) redefine its method for determining need." 397 U.S. at 419, 90 S.Ct. at 1221.

H.E.W. states its conclusions therefrom as follows:

"Pursuant to this acknowledgment by the Supreme Court in *Rosado* that 'fair averaging' would not achieve equivalency of payments to families before and after the system is instituted it has been the view of HEW

that if a State because of the nature of a given special need and the conditions under which it previously had been granted could provide the need by a new method other than fair averaging but such method were considered to meet the need in a manner consistent with the concept of fair averaging then section 402(a) (23) would not be violated.

\* \* \* \* \* \*

In accordance with the foregoing therefore, it has been the position of the Department of Health, Education, and Welfare that provided all the elements in the State's former standard of need are 'accounted for' a State may, depending upon the nature of the special need and the circumstances under which it was being given previously, change the method of providing for certain special needs by the use of some procedures other than the 'averaging' method.

\* \* \* \* \* \*

The State agency may provide through Emergency Assistance for those special needs items which are emergent and urgent in nature such as payment of an indebtedness to prevent eviction, or the loss of an essential utility, or to provide household items and clothing after a catastrophic event such as a fire or flood.

Thus, it can be seen that HEW regards the use of the emergency assistance program as a possible alternative for providing certain special need items but only in the particular circumstances *where the fundamental nature of the special need in question*

12. 45 C.F.R. § 233.20(a) (2) provides in part:

"Requirements for State Plans. A State Plan for \* \* \* AFDC \* \* \* must, as specified below:

\* \* \* \* \*

(i) Specify a statewide standard, expressed in money amounts, to be used in determining (a) the need of applicants and recipients and (b) the amount of the assistance payment.

(ii) In the AFDC plan, provide that by July 1, 1969, the State's standard

of assistance for the AFDC program will have been adjusted to reflect fully changes in living costs since such standards were established. \* \* \*

(v) If the State agency includes special need items in its standard, (a) describe those that will be recognized, *and the circumstances under which they will be included,* and (b) provide that they will be considered in the need determination for all applicants and recipients requiring them." (emphasis added).

*and the conditions under which it historically had been provided by the State agency* appropriately lend themselves to the fulfillment of such need under the said program. While it is recognized that the emergency assistance program has the statutorily prescribed limitation of the availability of Federal matching only for assistance which the State authorizes during one period of 30 consecutive days in any 12 consecutive months (including payments which are to meet needs which arose before such 30-day period or are for such needs as rent which extend beyond the 30-day period; see 45 C.F.R. 233.120(b) (3)), it is the position of HEW that the use of the emergency assistance program for the particularized special needs which are deemed to be appropriately met by such program is entirely consistent with the 'fair averaging' principle inherent in the method of consolidating special need items and incorporating them into the basic standard. Thus, in this connection, it is to be pointed out that whereas the increments to be added to the basic standard as a result of consolidation of special needs on the basis of statistical fair averages will not enable AFDC recipients in fact to purchase the items in question, under the emergency assistance program such recipients within the prescribed limitation as to time will have the special need items included in such program provided in full. Therefore, it is the view of HEW that with respect to those items of special need considered appropriate for placement within the emergency assistance program such items are not any less 'accounted for' under *Rosado* by inclusion in emergency assistance than if they are merged into the basic standard by the 'fair averaging' method.

\* \* \* \* \* \*

It is to be emphasized that although the emergency assistance program is considered by HEW as a possible alternative for providing those special need items which are readily adapta-

ble to such a program, a State in placing certain special need items into such a program cannot change the *scope* and *nature* of such items in a manner which will reduce their basic content." (emphasis added) (Brief for H.E.W. as Amicus Curiae at 4–8)

H.E.W.'s "nature and circumstances" test for determining the propriety of Rhode Island's transfer of items 4, 6 and 7 from special needs to Emergency Assistance is consistent with this Court's own rationale set forth above, since it specifically takes into account the *conditions* under which assistance is provided for each item under the respective programs. However, its ultimate conclusion is not as broad as this Court's, in that it appears not to agree that new restrictions upon eligibility by themselves can be sufficient to invalidate a State's program under § 402(a) (23):

"[W]hile the imposition of a large number of very stringent conditions upon the provision of emergency assistance might not per se be viewed as violating Federal requirements under the emergency assistance program, if it were to be determined that in practice the State agency so rigidly applied the conditions for receipt of emergency assistance as to seriously curtail the provision of special needs which HEW advised could be met under the emergency assistance program, HEW would have to reconsider whether the said program as administered by Rhode Island did represent a viable alternative under section 402(a) (23) and *Rosado* for the provision of such special needs." (Brief for H.E.W. as Amicus Curiae at 11.)

The defendants have stressed, both at the hearing of this matter and in their briefs, that Rhode Island has previously participated with partial federal funding in the Emergency Assistance Program under 42 U.S.C. § 606(e) (1) and that the current Program complies with the federal guidelines therefor, except with regard to household furnishings, which Mr. Affleck, the Director of the Depart-

ment, conceded is not in conformity with federal regulations. The evidence discloses that during the period January 1, 1968 to March 24, 1971, the State of Rhode Island ran an Emergency Public Assistance program only from February 1969 to February 1970. This Court fails to see the relevancy of that testimony to the issue presented, which is whether there has been an impermissible reduction in the content of the standard of need as it existed on January 1, 1968. The mere fact that the State now meets the criteria of § 606(e) (1) has no bearing upon the question whether the State AFDC program meets the separate requirement of § 602(a) (23). The latter provision recognizes that a State which attempts to modify its § 602 plan is not writing upon a clean slate—i. e., that its available options are circumscribed by its prior standard of need—and that compliance with § 606(e) (1) standards does not excuse non-compliance with § 602(a) (23) requirements.

## VIII

### Conclusions

■ Payment of indebtedness to save essential furniture from repossession having been totally eliminated under the May 13 regulations, it is the easiest item to deal with. *Rosado* is on all fours in invalidating that outright elimination. Similarly the change from "Guidelines for Usual Housekeeping Items" to "minimal essentials" is a clearly improper diminution of the content of the standard of need. I have not ignored Mr. Affleck's testimony that the change in language will not result in practice in a contraction of available assistance. I merely am realistically observing that it is not he, but rather members of his staff, who will be charged with carrying out the day-to-day implementation of the "minimal essentials" standard, and in their eyes the only reasonable interpretation of the emphatic change in language and the obsolescence of the "Guidelines" will be that

the State intends to meet a need for fewer household items. Similarly Mr. Affleck's representation that the broad "social desirability" standard of eligibility for moving expenses merely has been codified by the new regulations was unquestionably made in good faith, but it is dubious to think that AFDC recipients and their social workers will see the changes in that light. The deterrent effect of the new regulations upon requests for reimbursement for moving expenses is readily apparent. For that reason they are invalid. I note that H. E.W. is in complete accord.

The heart of this controversy is the dispute over the general criteria of the Emergency Assistance Program as they apply to former special need items 4, 6 and 7. This Court's position is that, even apart from the particular items referred to above, the State's adoption of that Program in lieu of certain former special needs items violates § 602(a) (23), because it constitutes a substantial reduction in the content of the standard of need as previously defined by Rhode Island. Whereas recipients were previously entitled to payments for household furnishings and equipment, indebtedness and moving expenses "as needed," the availability of assistance for those needs has been curtailed severely. This point is graphically expressed in the following excerpt from plaintiffs' brief:

"When special need items [4, 6 and 7] were included in the standard of assistance one was eligible for receipt of the required items at any time that need arose regardless of whether there was repetition or different items were needed in different months of the same year. It is obvious therefore that a provision which allows a family to receive their special needs requirements only to the extent that they are all required within the same month of the year does not fully account for all factors in the old equation. Rather than being entitled to the specified item when and as needed, the recipi-

ents will face a form of Russian roulette in which they must decide whether to ask for certain needed items as the need occurs and risk the chance of having to do without other requirements should need therefor arrive [sic] within the next twelve months."

 On the basis of the foregoing and upon the demonstration of irreparable injury presented in the affidavits and at the hearing, this Court enters a preliminary injunction enjoining the defendants, so long as the State of Rhode Island shall participate in the Aid to Families with Dependent Children Program under the Social Security Act, 42 U.S.C. §§ 601 et seq., from failing and refusing to accept, process and grant payments for household furnishings and equipment, indebtedness and moving expenses, under the criteria, regulations, procedures and circumstances in effect on March 24, 1971. The accompanying Order also sets forth appropriate procedures for notifying recipients of the terms of the Order.

This opinion constitutes the findings of fact and conclusions of law required by Rule 52(a).

## ORDER

This Court having considered the affidavits, testimony, arguments and briefs of the parties as well as the briefs of the Department of Health, Education and Welfare and of the General Assembly of the State of Rhode Island as amici curiae, and having concluded therefrom that the transfer by the State of Rhode Island of certain items from the special needs category of assistance of the AFDC program to the Emergency Assistance Program does not comply with the requirement of 42 U.S.C. § 602(a) (23), and having concluded further that there is imminent irreparable injury from the continued implementation of the nonconforming regulations by the defendants, it is hereby ORDERED that, so long as the State of Rhode Island shall participate in the Aid to Families with Dependent Children

Program under the Social Security Act (42 U.S.C. §§ 601 et seq.), defendants John J. Affleck, James H. Reilly, the Rhode Island Department of Social and Rehabilitative Services and their employees, agents, successors and assigns are preliminarily enjoined from failing and refusing to accept, process and grant payments for household furnishings and equipment, indebtedness and moving expenses under the criteria, regulations and procedures and circumstances in effect on March 24, 1971.

Defendants are further ordered to notify forthwith all applicants for and recipients of Aid to Families with Dependent Children, as well as all social case workers, case aides, supervisors and area supervisors, of the availability of these items under this Order.

This Order shall take effect forty-eight hours after its entry in the official records of this Court.