Tibursio and Maria **ALVARADO** et al.,
Plaintiffs,

v.

**Wilbur J. SCHMIDT, Individually and as
Secretary of the Wisconsin Department
of Health and Social Services, et al.,
Defendants.**

Civ. A. No. 69–C–210.

United States District Court,
W. D. Wisconsin.

Jan. 29, 1974.

Richard M. Klein and Steven H. Steinglass, Freedom Through Equality, Inc., and James A. Walrath, Milwaukee, Wis., for plaintiffs.

Robert W. Warren, Atty. Gen., and Donald P. Johns, Asst. Atty. Gen., Madison, Wis., for defendants, Wilbur J. Schmidt and Franklin Walsh.

Robert P. Russell, Corp. Counsel, and James J. O'Donnell, Deputy Corp. Counsel, Milwaukee, Wis., for defendants, Joseph E. Baldwin and William F. O'Donnell.

Before FAIRCHILD, Circuit Judge, DOYLE, District Judge, and REYNOLDS, Chief District Judge.

REYNOLDS, Chief District Judge.

On September 29, 1970, we found that the plan under which Wisconsin had distributed Aid to Families with Dependent Children ("AFDC") welfare benefits pursuant to § 49.19(11) of the Wisconsin Statutes (hereinafter "November 1969 plan") violated the provisions of § 402(a)(23), 42 U.S.C. § 602(a)(23) (Supp. IV 1968) of the federal Social Security Act. Alvarado v. Schmidt, 317 F.Supp. 1027 (W.D.Wis.1970). Rather than enjoin at once the use of federal funds, we allowed defendants, the officers of the Wisconsin Department of Health and Social Services, until November 13, 1970, to submit a detailed exposition of any new plan then in effect. Defendants then submitted a new plan which had become effective on July 1, 1970 (hereinafter "July 1970 plan")

However, plaintiffs, recipients of AFDC grants bringing this class action on behalf of all other eligible for such grants, contend this new plan also violates § 402(a)(23).

Plaintiffs contend that the July 1970 plan is defective in the following four respects:

1. Eligibility for AFDC benefits depends on whether the applicant's income is below the amount the State would pay him if he had no income and not on whether the applicant's income is below his standard of need.

2. The reorganization of the former special needs items does not represent a fair statistical averaging of the prior allowances for those items and effectively reduces the content of the standard of need.

3. All items in the old standard of need have not been repriced to reflect the cost-of-living increases occurring between the time the original amounts for

those items were set and the period in which repricing was required.

4. Section 49.19(11) of the Wisconsin Statutes, which the July 1970 plan implements, continues to obscure the actual standard of need by stating that maximum AFDC payments are limited to 120% of the national average.

Since this litigation began, the Wisconsin legislature has enacted Ch. 125, § 329, Wisconsin Laws (1971), which repealed and recreated the former § 49.19(11). Section 329 now limits AFDC payments to an expressed percentage of the standard of need, and its re-enactment has rendered plaintiffs' fourth contention moot. For the reasons stated below, we cannot find that plaintiffs' first contention constitutes a violation of the federal statute, and we grant partial relief in respect to the remaining contentions.

## I. *Basis for Eligibility*

Plaintiffs' first objection dealing with eligibility for AFDC benefits has been answered by the United States Supreme Court in Jefferson v. Hackney, 406 U.S. 535, 92 S.Ct. 1724, 32 L.Ed.2d 285 (1972). In that case Texas had employed the same system to determine eligibility used by defendants here. In the Texas system, the percentage reduction is applied to the standard of need to determine the payment level, and then that payment level, rather than the standard of need, determines eligibility.[1] The plaintiffs contend that all those with incomes under the standard of need should be eligible and should receive the difference between their income and the standard of need times the percentage reduction. Not only do the Texas and Wisconsin systems reduce the number eligible for AFDC benefits,[2] but they also reduce the payment to those eligible who have any outside income.[3]

In upholding the Texas system, the Supreme Court emphasized the wide discretion traditionally granted the States in allocating their AFDC resources. To the charge that § 402(a)(23) of the Social Security Act, as construed by the Supreme Court in Rosado v. Wyman, 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970), required a different result, the majority opinion by Justice Rehnquist replied:

"In Rosado v. Wyman, *supra*, the Court reviewed the history of this section and rejected the argument that it had worked any radical shift in

---

1. The payment level in Wisconsin is the total of the Basic Allowance, the Shelter Allowance, and other allowances available on an as needed basis. A legislative effort to exclude allowances available on an as needed basis from the figure used to determine eligibility was vetoed by the Governor. See Ch. 125, § 531(1)(a) (1971) Wis.Laws. Under the new § 49.19(11), Wisconsin paid 92% of need from the time the Act was passed until July 1, 1972, when the State began to pay 95%.

2. Being declared ineligible to receive AFDC benefits also affects one's eligibility to receive money payments under other categorical assistance programs. See 42 U.S.C. §§ 602(a)(14), (15); 42 U.S.C. §§ 602(a)(19), 632; 42 U.S.C. § 1396a(a)(10). In Wisconsin those ineligible for AFDC benefits are also ineligible to participate in the Work Incentive Program.

3. The illustration used by the Supreme Court in *Jefferson*, supra, at 539–540, n 6, 92 S.Ct. at 1728, is as follows:

"Assuming two identical families, each with a standard of need of $200, and outside, nonexempt income of $100, the two systems would produce these results:

| *Texas System* | *Alternative System* |
|---|---|
| $200 (need) | $200 (need) |
| ×.75 (% reduction factor) | −100 (outside income) |
| $150 (reduced need) | $100 (unmet need) |
| −100 (outside income) | ×.75 (% reduction factor) |
| $ 50 (benefits payable) | $ 75 (benefits payable)" |

the AFDC program. *Id.*, 397 U.S., at 414 and n. 17 [90 S.Ct. 1207 at 1218]. * * * Instead, the statute was meant to require the States to make cost-of-living adjustments to their standards of need, thereby serving 'two broad purposes':

" 'First, to require States to face up realistically to the magnitude of the public assistance requirement and lay bare the extent to which their· programs fall short of fulfilling actual need; second, to prod the States to apportion their payments on a more equitable basis.' *Id.*, at 412–413 [90 S.Ct. 1207 at 1218].

"Texas has complied with these two requirements. * * *" Jefferson v. Hackney, supra, 406 U.S. at 542– 543, 92 S.Ct. at 1729.

Naturally this opinion dealing precisely with the question of interpretation at issue here binds us.

II. *The Content of the Standard of Need*

■ ■ Plaintiffs object to defendants' determination of the standard of need in the July 1970 plan. With one exception not relevant here, § 402(a)(23), as construed in *Rosado*, supra, prohibits a State from substantially reducing the content of the standard of need after January 2, 1968, the day § 402(a)(23) took effect. Before that section took effect, States participating in the federal program had complete discretion in deciding what items to include in the standard of need. That section then foreclosed a State from eliminating or reducing the items it had previously

included.[4] States remain free, however, to reorganize and rename the items and to provide funds for them through different methods, as Wisconsin has done. Under *Rosado*, the issue is whether all factors in the old equation were accounted for and fairly priced and whether the reorganization on a statistical basis reflects a fair averaging.

■ The issue calls for a comparison of the standard of need before and after the 1969 reorganization. Prior to 1969 the standard of need was defined as the total of three categories—basic continually recurring needs, shelter needs, and special needs. (Plaintiffs' request for admissions #3 at 2.)[5] Shelter needs and basic needs were generally provided in the same manner after 1969. Most special needs items, however, were no longer available as special needs. Funds for those special needs items instead became available through two new allowances and through an addition to the Basic Allowance.

To be specific, funds for twenty-two special needs items had been available on an as needed basis under the old plan. In 1969 defendants added two new allowances to the standard of need:[6] the "Education and Rehabilitation Allowance" and the "Emergency Household and Clothing Inventory and Major Appliance Allowance" (hereinafter the "New Emergency Allowance"). Although these new allowances were not intended to be mere consolidations of past special needs items, at least eleven special needs items were included in the Education and Rehabilitation Allowance, and one and parts of two others, the

---

4. See 45 C.F.R. § 233.20(a)(2)(ii), 34 Fed. Reg. 1394 (1969), which says that a State may not reduce the content of the State standard of need by combining items in the standard. See also HEW State letters of October 17, 1969 (¶ 1, sub. 2–c, p. 2) and March 25, 1970, appendix to plaintiffs' supplemental brief, wherein HEW indicates that where a State has chosen to consolidate items in the standard of need, "[t]he updated revised or consolidated standard should be compatible in content and cost with the previous standards."

5. For a more detailed description of the items included, see Alvarado v. Schmidt, 317 F.Supp. 1027, 1033 (E.D.Wis.1970).

6. Other States have also reorganized the method by which they provide for special needs. Often the reorganization makes it difficult to determine if the content of the standard of need has been reduced. Rosado v. Wyman, 437 F.2d 619 (2d Cir. 1970); Rosado v. Wyman, 322 F.Supp. 1173 (S.D. N.Y.1970); Bryant v. Carleson, 444 F.2d 353 (9th Cir. 1971); Johnson v. White, 353 F.Supp. 69 (D.C.Conn.1972).

clothing and household replacement items, were included in the New Emergency Allowance. Three other former special needs items continued to be available as special needs, and five former special needs items, along with the remaining parts of the clothing and household replacement items, were declared not to be special needs but recurring basic needs which should be available to all recipients on a routine basis.[7] (Plaintiffs' request for admission of facts #26–34 at 11–14. Defendants' reply at 6.) Accordingly, their estimated total cost was averaged over the entire AFDC population to determine the amount needed by an average family. The resulting figures, $9, $11, and $13 for families of 1–5, 6–8, and 9 or more, respectively, were then added to the basic allowance.[8] (Deposition of Jerry Baskfield at 11.)

7. The following table illustrates the reorganization of the twenty-two former special needs items under the new plan. Of particular importance to this case is the diversion of funds for the clothing and household replacement special needs to either the Basic Allowance or the New Emergency Allowance.

Special Needs Items Now Provided Through Education and Rehabilitation Allowance

1. Housekeeping services
2. Home care
3. Guardian fees
4. Guide service (blind)
5. Child care
6. Adult education and training
7. School fees
8. Moving expenses
9. Attendant services
10. Spouse's expense for providing car
11. Miscellaneous services

Special Needs Items Still Available as Special Needs On An As Needed Basis

12. Major property repairs
13. Utility (and rental) deposits
14. Insurance

Special Needs Items Consolidated and Now Provided Through the Basic Allowance

15. Laundry
16. Telephone
17. Water or sewage
18. Transportation
19. Garbage collection
21. Clothing
22. Household replacements

Special Needs Items Now Provided Through the New Emergency Allowance

20. Emergency fuel and fuel adjustment
21. Clothing
22. Household replacements

At one point plaintiffs claimed that a special needs item for clothing repairs had also been available under the old plan. But defendants have since indicated that the clothing repair item was related to blindness and has always been funded through Aid to the Blind rather than AFDC. See defendants' reply to plaintiffs' requests for admissions #33 at 6.

———◆———

8. Under the November 1969 plan, defendants merely added these $9, $11, and $13 amounts to the Basic Allowance without increasing the standard of need for basic needs by a like amount. Defendant thereby created the appearance that they were meeting a greater proportion of the recipients' needs when in fact the increase in the allowance represented items that had formerly been available. This was a plain violation of § 402(a)(23), a major purpose of which, as stated in *Rosado*, was to force States to "face up realistically to the magnitude of the public assistance requirement and to lay bare the extent to which their programs fall short of fulfilling actual need." Accordingly we found the November 1969 plan defective. See Alvarado v. Schmidt, 317 F.Supp. 1027, 1039 (E.D.Wis.1970). In the July 1970 plan, the defendants cured this defect by

The two new allowances together with the addition to the Basic Allowance incorporated to some extent all special needs items no longer provided and were designed to lead to as much total spending as had occurred in the past for those special needs items. (Deposition of Best at 14–16.). Estimated past expenditures represented the amount which the defendants believed all recipients needed for the items. Though plaintiffs do not challenge the averaging of twenty of the former special needs items under the new plan, they do object to the treatment of the former clothing and household replacement special needs items. Therefore, we must consider these items.

Prior to 1968 the clothing and household replacement items were available to all AFDC recipients on the same basis as other special needs items. There was no ceiling on the amount which any one recipient could receive. The actual availability of the items depended on the interpretation which each caseworker gave to the criterion "as needed." (Defendants' reply to plaintiffs' request for admission of facts #14 at 4.) In March 1969, the defendants estimated the total annual cost of the clothing item as $1,283,844 and the cost of the household replacement item as $1,818,132 for a total estimated cost of $3,101.976. (Plaintiffs' request for admission of facts #41 at 16–17. Defendants' reply at 7.) When the special needs items were reorganized, part of the clothing and household replacement special needs

were included in the New Emergency Allowance, and the remaining part was consolidated with five other former special needs items to form $9, $11, and $13 additions to the Basic Allowance. Of the $3,101,976 estimated total cost of these two former special needs items, $2,222,410 was earmarked for the New Emergency Allowance and the remainder of $879,566 was taken as the amount available for consolidation with the Basic Allowance. (Deposition of Bankfield at 13.)

Plaintiffs believe the amount earmarked for the New Emergency Allowance was too large, and, thus, the remainder available for consolidation into the Basic Allowance was too small. But since needs met through the New Emergency Allowance are as much a part of a recipient's total need as those needs met through the Basic Allowance, the allocation of funds representing the past total need for the items between the two allowances would not seem to affect the overall standard of need.[9]

Of course, the standard of need would be lowered if the defendants imposed more stringent conditions on the provision of funds for the items through the New Emergency Allowance than had previously been imposed and if, as a result, provision of funds for those items was seriously curtailed. Here conditions imposed on the provision of funds for clothing and household replacements through the New Emergency Allowance were more strict than the conditions previously imposed when the items were

adding the $9, $11, and $13 amounts to the standard of need for basic needs.

9. The Department of Health, Education, and Welfare has addressed this matter explicitly in stating its position in Rhode Island Fair Welfare Rights Organization v. Department of Social and Rehabilitative Services, D.C., 329 F.Supp. 860, 868 (1971):

"'* * * The State agency may provide through Emergency Assistance for those special needs items which are emergent and urgent in nature such as payment of an indebtedness to prevent eviction, or the loss of an essential utility, or to provide household items and clothing after a catastrophic event such as a fire or flood.

"'Thus, it can be seen that HEW regards the use of the emergency assistance program as a possible alternative for providing certain special need items but only in the particular circumstances *where the fundamental nature of the special need in question and the conditions under which it historically had been provided by the State agency* appropriately lend themselves to the fulfillment of such need under the said program. * * *'"

Plaintiff does not contend that the special needs incorporated in the New Emergency Plan were of such a nature that incorporation was inappropriate.

treated as special needs. However, the method of reorganization employed by defendants, i. e., dividing the amount previously funded for the items between the New Emergency Allowance and the Basic Allowance, should have ensured that any reduction in the provision of funds through the New Emergency Allowance caused by these more restrictive conditions would have made correspondingly more funds available for consolidation in the Basic Allowance. In fact, total expenditures have increased under the new plan, and it appears that past estimates of the expenditures under the New Emergency Allowance were too low.

■ The basis of plaintiffs' contention that earmarking too much for the New Emergency Allowance and thus too little for consolidation with the Basic Allowance reduced the overall standard of need is not clear. Evidently the alleged defect is that where before funds for all clothing and household replacement special needs items were available to all recipients on an as needed basis, now those funds available through the New Emergency Allowance are available under more restrictive conditions so that, in fact, the bulk of that assistance goes only to new recipients. However, the Supreme Court in *Rosado* emphasized that such a redistribution of AFDC benefits was not a violation of the federal statute where, as here, the total funding earmarked for the items was not reduced:

> " * * * We do not, of course, hold that New York may not, consistently with the federal statutes, consolidate items on the basis of statistical averages. *Obviously such averaging may affect some families adversely and benefit others.* * * * " (Emphasis added.) Rosado v. Wyman, 397 U.S. 397, 419, 90 S.Ct. 1207, 1221, 25 L.Ed.2d 442 (1970).

The same principle answers plaintiffs' other contention that the reorganization was faulty because all recipients are now given the $9, $11, and $13 amounts, where before a few recipients were given much more for the items those figures represent while others were given less or none at all.

■ We recognize the difficulty any individual plaintiff encounters in disputing the estimates made by a welfare agency of the amount it has spent in the past and will spend in the future for items formerly funded as special needs but now funded only through a new allowance. But once an agency introduces a new plan based on these estimates and no unexplained reduction in expenditures appears, some evidence that the estimates were erroneous is necessary before it can be found that the averaging was not fair.

■ The standard of need, however, can be reduced in less subtle ways than through failure to consolidate or reorganize on the basis of fair averaging. Outright elimination of former special needs items, as in *Rosado,* is surely a violation of the federal statute. Similarly, imposition of more restrictive conditions on the availability of items so as to make total expenditures for the items less is also a reduction of the standard of need. See Rhode Island Fair Welfare Rights Organization v. Department of Social and Rehabilitative Services, 329 F.Supp. 860 (D.C.1971).

■ Though plaintiffs have not raised the matter in their brief, the evidence indicates that funds for one special needs item which has continued to be treated as a special needs item are now available under more restrictive conditions than before 1968. To get funds for the item, which is major property repairs, a recipient had only to show that the funds were necessary to improve or maintain housing standards, but under the July 1970 plan he must show that funds are necessary to prevent major deterioration and to maintain safety, sanitation, and a minimum standard of comfort. (Plaintiffs' request for admission of facts #32 at 13. Defendants' reply at 6.) It is as apparent to us as it will be to the caseworkers who grant funds for this special need that the present condition is more re-

strictive than the prior one. Though there is no evidence as to whether the provision of funds for major property repairs has been seriously curtailed, we agree with the district court in Rhode Island Fair Welfare Rights Organization v. Department of Social and Rehabilitative Services, supra, at 869, that " * * * new restrictions upon eligibility [for special needs items] by themselves can be sufficient to invalidate a State's program under § 402(a)(23)." Since defendants have not shown that any decrease in expenditures for this special needs item caused by the more restrictive condition has been offset by an increase in expenditures for this special need under some other allowance, we find the new conditions represent a reduction in the standard of need and that the old conditions for the granting of funds for major property repairs must be restored.

### III. *The Cost-of-Living Adjustments*

Section 402(a)(23) requires that "by July 1, 1969, the amounts used by the State to determine the needs of individuals will have been adjusted to reflect fully changes in living costs since such amounts were established * * *." We held in the original opinion that this mandate compelled defendants to make cost-of-living adjustments for each item in the old standard of need. We found that defendants had violated the statute in failing to make adjustments for some items at all and in failing to make adjustments for others by July 1, 1969. The issue here is whether under the July 1970 plan all the adjustments have finally been made.

The clothing component in the Basic Allowance is one item that has not been fully adjusted. An amount for clothing was established in July 1967. Though pursuant to § 402(a)(23) amounts for other items were increased to reflect cost-of-living changes between July 1967 and September 1968, defendants admit that the amount for clothing was not increased. (Defendants' brief filed Oct. 21, 1971, at 19.) Defendants do not contend that the cost of clothing remained constant through that period. Rather they justify their failure to adjust the price on the ground that the prior amount was adequate for September 1968, even though it had not been raised.

This justification does not satisfy the requirement of § 402(a)(23). By its terms this statute required the components of the standard to be adjusted to reflect price changes "since such amounts were established." The fact that the July 1967 amounts may have been "fair" in light of the needs of recipients in September 1968 does not alter the duty to update. To comply with § 402(a)(23), defendants must now increase the amount needed for the clothing component by a percentage that reflects the rise in price for that item between the time when the prior amount was set and January 2, 1968, when § 402(a)(23) became effective.

The evidence indicates that defendants have updated the amount needed for the other items formerly supplied through the Basic Allowance. (Plaintiffs' request for admission of facts #53 at 21. Defendants' reply at 9.) In addition, plaintiffs do not dispute defendants' assertion that proper adjustments were made in July 1969 for the items incorporated into the New Emergency Allowance. (Defendants' reply to plaintiffs' request for admission of facts at 10. Deposition of Frank Newgent at 10.)

In deciding whether the other items formerly available as special needs were adjusted when they were reorganized under the July 1970 plan, a key distinction is necessary. Most of these former special needs items, including the clothing and household replacement items, those items incorporated into the Education and Rehabilitation Allowance, and those items continued as special needs, had been available to recipients as needed at their actual cost. Allowances for a few of the items, on the other hand, were subject to a fixed ceiling. For the items available at actual cost updating occurred automatically. And the study

of the amount expended for those items, which was made in March 1969 and on which the reorganization was based, necessarily reflected March 1969 prices and the rise in prices from any time in the past. Of course, the individual caseworkers could have circumvented the need to update by insisting that recipients obtain special needs items of lower quality than in the past. But the record does not support the conclusion that caseworkers in the aggregate were unusually penurious in this respect during the period in which updating was required. Moreover, to ensure that caseworkers did not subvert the federal statute in this way, the State plan would have had to set minimum allowances for every item supplied on an as needed basis at the sacrifice of considerable flexibility and efficiency.

A different situation, however, was present with the special needs items for which maximum allowances had been set. Such maximums had been set for at least the telephone, laundry, and water or sewage special needs items which were consolidated to form, in part, the $9, $11, and $13 additions to the Basic Allowance.[10] The consolidation of those items, which is still in effect under the July 1970 plan, was based on the expenditures for those items as determined by the March 1969 study. Defendants admit, however, that the study did not reflect March 1969 prices, since the expenditures were limited to maximums established in 1967. (Plaintiffs' request for admission of facts #43 at 17. Defendants' reply at 7.) Failing to increase the maximum expenditures to keep pace with the rise in price of the items between 1967 and 1969 was a plain violation of § 402(a)(23). The $9, $11, and $13 amounts, reflecting in part the 1967 prices for these items, were consequently too low and must be adjusted accordingly.

In 1967 a maximum of $4 was placed on the allowance for minor upkeep and

repairs of all homestead property owned by recipients, including trailers. (Plaintiffs' request for admission of facts #35 and #63 at 14 and 25. Defendants' reply at 7 and 9.) That allowance has continued to be available on the same conditions under the July 1970 plan. The maximum, however, has also stayed the same, though the requirements of § 402(a)(23) apply to it as well. Therefore, to comply with the statute defendants must increase that maximum by the cost-of-living increase that occurred between the time the maximum was set and January 2, 1968. The possible insignificance of the amount involved does not make the statutory mandate any less compelling.

### IV. *Remedy*

On the basis of the briefs, the depositions, and the other evidence submitted, we have found that to comply with § 402(a)(23), defendants must alter their plan of July 1970 under which they administer AFDC benefits in at least the following minor respects. They must return to the conditions they had used under the July 1967 plan to determine whether a recipient was entitled to funds for major property repairs. They must increase the standard of need for the clothing component in the Basic Allowance and for the so-called common items in the Basic Allowance to reflect the increase in the price of clothing and the price of telephone, laundry, and water or sewage service between the time the prior standards were established and January 2, 1968. They must also increase the maximum allowance for minor upkeep and repairs of homestead property to reflect the increase in price for upkeep and repairs between the time such maximum was established and January 2, 1968.

### V. *Order.*

Following the pattern in our original opinion,

It is ordered that defendants are to submit a conforming plan within forty-

---

10. The dollar maximums were as follows: telephone, $5; laundry, 1–4 persons, $5; laundry, 5 or more persons, $9; water or sewage, $4.

five days of the filing date of this opinion and order or be enjoined from using federal funds. Requests for retroactive damages arising from the nonconformity of the July 1970 plan with the federal statutes shall be addressed to the single district judge assigned to determine the retroactive damages arising from the nonconformity of the November 1969 plan.